**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 17-cv-00357-CMA-MLC

WILDEARTH GUARDIANS,

      Plaintiff,

v.

COLORADO SPRINGS UTILITIES BOARD,
COLORADO SPRINGS UTILITIES, and
CITY OF COLORADO SPRINGS,

      Defendants.

---

**ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

      This matter is before the Court on the parties' competing motions for summary judgment:

1. Defendants Colorado Springs Utilities Board, Colorado Springs Utilities, and the City of Colorado Springs' (collectively, "Defendants") Motion for Summary Judgment (Doc. # 33), and

2. Plaintiff WildEarth Guardians' Motion for Partial Summary Judgment (Doc. # 34).

For the reasons described below, the Court denies Defendants' Motion for Summary Judgment (Doc. # 33) and denies Plaintiff's Motion for Partial Summary Judgment (Doc. # 34).

# I.  BACKGROUND

Plaintiff WildEarth Guardians is a nonprofit, membership organization that seeks to reduce air pollution and its adverse effects in the western United States.  (Doc. # 15 at 3–4.)  Plaintiff has more than 200,000 members from across the country, approximately 483 of whom live in Colorado Springs, Colorado.  (*Id*. at 3.)

Defendant City of Colorado Springs is a home-rule municipality incorporated in Colorado.  (Doc. # 33 at 4.)  Defendant Colorado Springs Utilities is an enterprise of the City and operates the Martin Drake Power Plant pursuant to the city charter and the state constitution.  (*Id.*)  Defendant Colorado Springs Utilities Board is composed of the city council's members and is the Board of Directors of Colorado Springs Utilities.  (*Id.*)

The Martin Drake Power Plant (the "Plant") is located at 7000 Conejos Street, Colorado Springs.  (*Id.* at 5.)  Relevant here, the Plant has three coal-fired, electricity generator units: Units 5, 6, and 7, built in 1962, 1968, and 1974, respectively.  (*Id*.)  Unit 5 was permanently shut down in December 2016.  (*Id*.)  Units 6 and 7 remain in operation.  (*Id*.)

## A.  CONTROLLING LAW, REGULATIONS, AND PERMIT REQUIREMENTS

### 1.  The Clean Air Act

The Clean Air Act (the "Act" or the "CAA") is a comprehensive federal scheme that regulates air emissions from stationary and mobile sources, with the aim of "protect[ing] and enhanc[ing] the quality of the Nation's air resources."  42 U.S.C. § 7401(b)(1).  The Act directs the Environmental Protection Agency (the "EPA") to establish National Ambient Air Quality Standards, which define levels of air quality

necessary to protect the public health.  42 U.S.C. § 7409; 40 C.F.R. § 50.2(b).  States are required to develop State Implementation Plans ("SIPs"), applicable to certain industrial sources of air pollutants, in order to achieve these standards.  42 U.S.C. § 7410(a)(1).  SIPs are subject to the EPA's approval.  42 U.S.C. § 7410(a)(3)(B).

The Act provides for at least two enforcement mechanisms: first, the EPA may order compliance, issue an administrative penalty, or bring a civil action against the violator.  42 U.S.C. § 7413(a)(1); 40 C.F.R. § 52.23.  Second, and most important to this matter, the Act contains a citizen suit provision.  42 U.S.C. § 7604.  The citizen suit provision empowers "any person" to "commence a civil action on his own behalf" against "any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation."  42 U.S.C. § 7604(a)(1).  The district court in which a citizen suit is filed has jurisdiction to provide injunctive relief and "to apply any appropriate civil penalties."  42 U.S.C. § 7604(a).  Such civil penalties may be up to $37,500 per day for each violation committed between January 12, 2009, and November 2, 2015, and up to $93,750 per day for each violation committed after November 2, 2015.  40 C.F.R. § 19.4.

Two titles of the Clean Air Act are relevant to the instant suit.  First, Title IV, known as the Acid Rain Program, is intended to reduce the adverse effects of acid deposition by mandating reductions in emissions of sulfur dioxide and nitrogen oxides.  42 U.S.C. § 7651(b).  Certain industrial sources, including power plants, are required to install and operate a continuous emission monitoring system ("CEMS") at each source of such emissions to "provide on a continuous basis a permanent record of emissions

and flow."  42 U.S.C. § 7651k(a); 42 U.S.C. § 7651a(7); *see generally* 40 C.F.R. § 72.

When required CEMS data is not available, "and the owner or operator cannot provide

information, satisfactory to the [EPA], on emissions during that period," the EPA "shall

deem the unit to be operating in an uncontrolled manner during the entire period for

which the data was not available."  42 U.S.C. § 7651k(d).

Second, Title V of the Clean Air Act requires certain industrial sources to obtain

and operate in compliance with an operating permit.  42 U.S.C. § 7661b(a).  An

operating permit must include "enforceable emission limitations and standards, a

schedule of compliance, [and] a requirement that [a] permittee submit to the permitting

authority . . . the results of any required monitoring."  42 U.S.C. § 7661c(a); *see*

*generally* 40 C.F.R. § 70.

One such form of required monitoring is opacity[1] monitoring.  40 C.F.R.

§ 75.10(a)(4).  Power plants and other certain industrial sources must maintain a

continuous opacity monitoring system ("COMS") with an automated data acquisition

system "for measuring and recording the opacity of emissions (in percent opacity)

discharged to the atmosphere" every six minutes.  *Id.*; 40 C.F.R. § 75.10(d)(2).  A

source's COMS must be in operation and measuring opacity "at all times that the

effective unit combusts any fuel[,] **except** . . . during periods of calibration, quality

assurance, or preventative maintenance . . . , periods of repair, periods of backups of

data . . . , or recertification," and at all times "following combustion when fans are still

operating."  40 C.F.R. § 75.10(d) (emphasis added).

---

[1] Opacity is "the degree to which emissions reduce the transmission of light and obscure the
view of an object in the background."  40 C.F.R. § 60.2.

Every state is charged with administering its own Title V operating permit program, subject to the requirements of Title V and to the approval of the EPA. 40 C.F.R. § 70.1(a). The Colorado Department of Public Health and Environment's ("CDPHE") operating permit program was approved by the EPA on October 16, 2000. 40 C.F.R. § 70, App'x A; *see* Colo. Rev. Stat. § 25-7-114.3. Pursuant to Colorado regulations, a stationary industrial source may not "allow or cause the emission into the atmosphere of any air pollutant that in excess of 20% opacity" in any six-minute period, except when the source is undergoing "process modification, or adjustment or occasional cleaning of control equipment." 5 C.C.R. §§ 1001-3, II.A.1–4.

    2.  <u>The Plant's Operating Permit</u>

CDPHE issued the Plant its initial Title V operating permit on November 1, 2002, and a revised Title V operating permit on April 13, 2004. *See* (Doc. # 33-1 at 3–81.) The Plant's operating permit incorporates COMS requirements set forth in the federal regulations, *see* 40 C.F.R. § 75, and in Colorado's regulations, *see* 5 C.C.R. §§ 1001-3, II.A.1–4. (Doc. # 33-1 at 31, 33–34.)

**B.    PROCEDURAL HISTORY**

Plaintiff filed this action against Defendants on February 9, 2017. (Doc. # 1.) In its Amended Complaint, Plaintiff alleges a single claim for relief, alleging that the Plant violated continuous opacity monitoring requirements, in breach of Titles IV and V of the Act, federal regulations, Colorado's operating permit plan and regulations, and the Plant's Title IV operating permit. (Doc. # 15 at 15.) Specifically, Plaintiff asserts that there was at least 18,930 minutes of "COMS downtime" between April 11, 2011, and

December 13, 2015, during which time Defendants failed to monitor opacity of emissions at the Plant. (*Id.*) Plaintiff further alleges that these unmonitored minutes "[did] not fall within one of the limited downtime exceptions" identified at 40 C.F.R. § 75.10(d) and were thus "unexcused." (*Id.*) Because opacity is monitored and reported in six-minute intervals, Plaintiff contends that the 18,930 minutes of unmonitored "downtime" represents 3,155 violations of the Clean Air Act and its implementing regulations. (*Id.*) Plaintiff seeks declaratory relief; an order to Defendants, mandating compliance with COMS requirements; civil penalties against Defendants; and an award of reasonable costs and attorneys' fees. (*Id*. at 16.) Defendants timely answered on May 23, 2017. (Doc. # 19.)

Defendants moved for summary judgment on September 26, 2017, and argue that Plaintiff lacks standing and that its claim therefore must be dismissed for lack of jurisdiction. (Doc. # 33.) Plaintiff filed a response brief on October 17, 2017 (Doc. # 36), to which Defendants replied on October 31, 2017 (Doc. # 38).

Plaintiff moved for partial summary judgment on September 26, 2017, seeking summary judgment that Defendants violated the Clean Air Act on 91 occasions (totaling 1,848 six-minute increments) because none of the statutory exceptions to COMS requirements applied to those 91 instances of "downtime".[2] (Doc. # 34.) Defendants responded on October 17, 2017. (Doc. # 37.) Plaintiff replied on October 31, 2017. (Doc. # 39.)

_____

[2] In its Amended Complaint, Plaintiff alleges 147 incidents of unexcused downtime, totaling to 3,155 violations of the Act. (Doc. # 15 at 15.) In its motion for partial summary judgment, Plaintiff does not seek summary judgment on the remaining 56 incidents. (Doc. # 34 at 1 n.1.)

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id*. However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id*. In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.  *Id.*  Rather, the nonmoving

party must "set forth specific facts that would be admissible in evidence in the event of

trial from which a rational trier of fact could find for the nonmovant."  *Adler*, 144 F.3d at

671.  Stated differently, the party must provide "significantly probative evidence" that

would support a verdict in her favor.  *Jaramillo v. Adams Cty. Sch. Dist. 14*, 680 F.3d

1267, 1269 (10th Cir. 2012).  "To accomplish this, the facts must be identified by

reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."

*Id.*

### III.    DISCUSSION

The Court necessarily begins by addressing Defendants' Motion for Summary

Judgment because Defendants contend that the Court lacks jurisdiction over the instant

case.  Because it concludes that Plaintiff has standing to bring this action against

Defendants, the Court then addresses Plaintiff's Motion for Partial Summary Judgment.

### A.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants argue that Plaintiff does not have standing to bring this action and,

thus, this Court must dismiss the case for lack of jurisdiction.  (Doc. # 33 at 4.)

### 1.  Principles of Standing

The jurisdiction of federal courts is limited to "Cases" and "Controversies."  U.S.

Const. art. III, § 2, cl. 1; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).

This has always been taken to mean cases and controversies "traditionally amenable

to, and resolved by, the judicial process."  *Steel Co.*, 523 U.S at 102 (citing *Muskrat v.

United States*, 219 U.S. 346, 356–57 (1911)).  The doctrine of standing "serves to

identify those disputes which are appropriately resolved through the judicial process."
*Whitmore v. Ark.*, 495 U.S. 149, 155 (1990).  Relevant here, the doctrine ensures that a plaintiff has a sufficient personal stake in the dispute to ensure the existence of a live case or controversy.  *See Allen v. Wright*, 468 U.S. 737, 750–51 (1984).

The "irreducible constitutional minimum of standing" contains three elements. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992).  A plaintiff must show that: (1) he or she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there is causation—a "fairly traceable" connection between the plaintiff's injury and the challenged action of the defendant; and (3) it is "likely, as opposed to merely speculative," that the plaintiff's injury "will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000) (quoting *Def. of Wildlife*, 504 U.S. at 560–61).  A membership association has standing to bring suit on behalf of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Id*. at 181 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The plaintiff invoking federal court jurisdiction "always has the burden of proving standing . . . no matter how or when the issue is raised."  *Colo. Manufactured Hous. Ass'n v. Bd. of Cty. Comm'rs*, 946 F. Supp. 1539, 1543 (D. Colo. 1996).  Thus, where standing is raised in a motion for summary judgment, the usual burden of proof for summary judgment does not apply.  *See Glover River Org. v. United States Dep't of*

*Interior*, 675 F.2d 251, 254 n.3 (10th Cir. 1982). Instead, the plaintiff bears the burden

of demonstrating that standing exists. *Id.* (noting that where a case proceeds to

summary judgment, the plaintiff "must do more than plead standing; he must prove it");

*Colo. Manufactured Hous. Ass'n*, 946 F. Supp. at 1543 ("the burden is on the plaintiff,

on a motion for summary judgment, to demonstrate that standing exists"). The plaintiff

"must present specific facts." *Gilbert v. Shalala*, 45 F.3d 1391, 1394 (10th Cir. 1995).

The specific facts alleged in the complaint, as well as additional information uncovered

by discovery, should be accepted as true and construed in favor of the plaintiff.

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 109 n.22 (1979).

    2. <u>Application</u>

    In the matter before the Court, Plaintiff asserts that it has associational standing

because its members "live and recreate in the vicinity of [the Plant] and are harmed by

the failure of [Defendants] to comply with [their] legally required air pollution monitoring

requirements." (Doc. # 15 at 4.) To substantiate its standing, Plaintiff disclosed to

Defendants declarations of four of its members who live and recreate near the Plant:

Nicole Rosa (Doc. # 33-1 at 129–32); Jacqueline Ostrom (*id.* at 137–41); Leslie Weise

(*id.* at 151–55); and Mark Robinson (*id.* at 156–59). (Doc. # 33 at 6–7; Doc. # 36 at 3.)

The Court accepts specific factual allegations in these declarations as true and

construes them in favor of Plaintiff in reviewing Defendants' Motion for Summary

Judgment. *See Gladstone Realtors*, 441 U.S. at 109 n.22.

    Defendants argue that Plaintiff fails to prove each of the three elements of

standing. (Doc. # 33 at 9.) The Court addresses each element in turn.

### a. *Injury-In-Fact*

The injury-in-fact element of standing is satisfied differently depending on whether the plaintiff seeks prospective or retrospective relief. *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983)). A plaintiff seeking prospective relief must be "suffering a continuous injury or be under a real and immediate threat of being injured in the future." *Id*. The threatened injury must be "certainly impending;" a claimed injury contingent on speculation or conjecture is insufficient. *Id*. at 1283–84 (quoting *Laidlaw*, 528 U.S. at 190). A plaintiff seeking retrospective relief, on the other hand, satisfies the injury-in-fact requirement if his or her alleged past injury was concrete and particularized. *Id*. at 1284 (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995)).

In the instant matter, Plaintiff seeks both prospective and retrospective relief. *See* (Doc. # 15 at 16). It asserts three "concrete and imminent injuries" to its members who "live, work, and recreate in [the Plant's] immediate vicinity": "(1) justifiable fear of health risks; (2) diminishment of aesthetic interests; and (3) diminished recreational enjoyment." (Doc. # 36 at 4–5.) Defendants contend that Plaintiff's members' "concerns" are merely "vague speculation . . . insufficient to create standing." (Doc. # 33 at 10.) The Court is not persuaded by Defendants' argument because it neglects the underlying purpose of the Clean Air Act.

The purpose of the CAA is to protect and improve air quality "so as to promote the public health and welfare and the productivity capacity of [the Nation's] population." 42 U.S.C. § 7401(b)(1). The Act authorizes the EPA to require certain industrial

sources to monitor, record, and report emissions and other data points, 42 U.S.C.

§ 7414(a)(1), and the EPA has required opacity monitoring as one such measurement,

40 C.F.R. §§ 75.1(a), 75.13. In short, as the Court explained in *Wildearth Guardians v.*

*Public Service Co. of Colorado*, "opacity monitoring has been authorized to

quantitatively measure the air quality." No. 09-cv-01862-ZLW-MEH, 2010 WL 1568574,

*2 (D. Colo. April 15, 2010). Violation of opacity monitoring requirements is illegal and

is punishable by law. *Id.*

The Act authorizes a private citizen to initiate a civil action against "any person

. . . who is alleged to have violated . . . or to be in violation of . . . an emission standard

or limitation under this chapter." 42 U.S.C. § 7604(a)(1). The Act defines the term

"emission standard or limitation under this chapter" as including "**any other standard,**

**limitation**, or schedule **established under any permit issued pursuant to [Title V** of

the CAA] or under any applicable [SIP] . . . , [and] **any permit term or condition**." 42

U.S.C. § 7604(f)(4) (emphasis added). Because opacity monitoring is required by

federal regulation, *see* 40 C.F.R. § 75.10(a)(4), and by Colorado's SIP and regulations,

*see* Colo. Rev. Stat. § 25-7-114.3, 5 C.C.R. §§ 1001-3, II.A.1–4, and is integrated in

Title V operating permits issued by CDPHE, the Act certainly authorizes a private citizen

to initiate a civil action where a defendant has allegedly violated continuous opacity

monitoring requirements. *See Sierra Club v. Ga. Power Co.*, 443 F.3d 1346, 1349 (11th

Cir. 2006) ("citizens may sue to enforce the terms of a . . . Title V permit"). "[V]iolation

of opacity monitoring is necessarily an injury in fact attributable to the monitoring

violator." *Pub. Serv. Co. of Colo.*, 2010 WL 1568574 at *2.

In this action, Plaintiff has satisfactorily demonstrated injury-in-fact to its members. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the areas will be lessened'" by the complained-of conduct. *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). All four of Plaintiff's members live and recreate in close proximity to the Plant, *see* (Doc. # 33-1 at 129–59), and consequently are within the area affected by Defendants' alleged misconduct. The members also aver that they believe that when Defendants fail to continuously monitor opacity, "levels of harmful air pollutants are not known, potentially resulting in excess emissions," and that they are aware of the harmful health effects of the Plant's emissions. (Doc. # 36 at 7); *see* (Doc. # 33-1 at 129–59). Two of the declarants, Ms. Rosa and Ms. Ostrom, assert that they regularly curtail outdoor activities near their homes and the Plant for fear of excess emissions. (Doc. # 33-1 at 129, 138–39.) These members' declarations sufficiently illustrate injury-in-fact. *See Laidlaw*, 528 U.S. at 184 (holding that the affiants' conditional statements—that they would use a river area if the defendant was not polluting it—were not "'some day' intentions . . . insufficient to show injury"); *Pub. Serv. Co. of Colo.*, 2010 WL 1568574 at *2 (where the plaintiff organization alleged the defendant violated opacity monitoring requirements, holding that the plaintiff's members' concerns about recreational and aesthetic interests were sufficient injury-in-fact)[3].

---

[3] The Court rejects Defendants' attempt to distinguish *Public Service Co. of Colorado*, 2010 WL 1568574 at *2, from the instant action. *See* (Doc. # 38 at 4.) In both *Public Service Co.* and the

*Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109 (4th Cir. 1988), is

persuasive.[4] Therein, the plaintiff alleged that the defendant violated the Clean Water

Act[5] by failing to report quarterly on its discharge of pollutants into navigable waters. *Id*.

at 1111. The plaintiff submitted an affidavit of one of its members who "regularly use[d]

and enjoy[ed]" the waterway at issue. *Id*. at 1112. The defendant challenged the

plaintiff's standing, and the plaintiff responded that its members had been injured by

alleged reporting violations because the members were unable to know the full extent of

pollution into the waterway. *Id*. The Fourth Circuit agreed with the plaintiff and held that

it did have standing. *Id*. at 1113. The Fourth Circuit explained:

> [the plaintiff's member's] affidavit adequately establishes injury and the threat of
> future injury, stemming from [the defendant's] failure to report concerning harmful
> effluents for which its permit contained maximum discharge levels . . . . As a
> result of these violations, information on any harmful level of pollutants in the
> area of [the defendant's] plant during this time period is forever lost to
> environmental planners and policymakers and those who might undertake to
> remedy the effects of any pollution. Moreover, [the defendant's] failure to report
> on levels of harmful effluents subject to maximum discharge limitations threatens
> [the member's] prospective interest in protecting the environmental integrity of
> the [waterway] and curtailing any ongoing unlawful discharges into its waters.
> The actual injury stemming from reporting and sampling violations, coupled with
> the threatened injury stemming from failure to report on maximum levels of
> harmful effluents, establishes injury.

---

instant matter, the plaintiffs alleged only that the defendant violated opacity monitoring
requirements. Neither plaintiff alleged that the defendant had exceeded emissions limits.
[4] Defendants' attempt to distinguish *Simkins*, 847 F.2d at 1112–13, fails to move the Court. *See*
(Doc. # 38 at 5.) Defendant's statement that "that there was direct evidence of illegal pollution
going into the river and [the Fourth Circuit] based its standing decision on that evidence," *see
id.*, mischaracterizes the nature of the plaintiff's claims in *Simkins*. *See Simkins*, 847 F.2d at
1111.
[5] The Clean Air Act and the Clean Water Act use similar means, including citizen suit provisions.
The Supreme Court and other courts have relied on cases decided under one statute when
interpreting the other. *See, e.g., Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49, 62 (1987).

*Id*.  For the same reasons that the Fourth Circuit found standing in *Simkins*, the Court concludes that in the instant matter, the declarations of Plaintiff''s members establish injury-in-fact.  Plaintiff has presented specific facts to demonstrate an injury-in-fact and has satisfied the first element of standing.

        b.  <u>Causation</u>

The causation element of standing requires a plaintiff to demonstrate that his or her alleged injury "fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976).  The causation, or traceability, requirement "exists to eliminate those cases in which a third party and not a party before the court causes the injury. *Am. Canoe Ass'n, Inc. v. Louisa Water & Sewer Comm'n*, 389 F.3d 536, 532 (6th Cir. 2004) (citing *Def. of Wildlife*, 504 U.S. at 560).  In the context of an environmental pollution case, a plaintiff "'must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged' in the specific geographic area of concern."  *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000) (internal citation omitted).

In the instant suit, Plaintiff's alleged injury is fairly traceable to Defendants' action.  Plaintiff alleges that its members' injuries to their aesthetic and recreation interests were undoubtedly caused by Defendant's alleged failure to continuously monitor opacity.  Therefore, Plaintiff has adequately alleged injury traceable to Defendants' conduct.  *See Pub. Serv. Co. of Colo.*, 2010 WL 1568574 at *2.

Defendants' arguments that Plaintiff has not established traceability are unconvincing. *See* (Doc. # 33 at 11, 13.) First, Defendants contend that a violation of a monitoring requirement can never cause an injury; rather, any recreational, aesthetic, or physical injuries can be traced only to actual "actual exceedances of emission limits." (*Id*. at 11.) The Court has already rejected this argument. As the Court explained above, violations of monitoring and reporting requirements are injuries. *See, e.g.*, *Pub. Serv. Co. of Colo.*, 2010 WL 1568574 at *2.

Second, Defendants assert that Plaintiff's members must be able to trace their injuries to specific periods of "unexcused monitor downtime" (*i.e.*, specific periods for which the COMS data is not available). (Doc. # 38 at 7.) This argument has been squarely rejected by courts. As the Fifth Circuit described, "[n]o relevant case law supports [the] argument that [a plaintiff claiming violation of pollution standards] must connect the exact time of their injuries with the exact time of an alleged violation by [the defendant]." *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 793 (5th Cir. 2000); *see also Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 661 (E.D. La. 2010) ("[the plaintiff] need not pinpoint the exact times of violations and link its members' injuries to permit violations at those times"). Such an argument fails in part because it conflates the issue of standing with the issue of actual liability. *Texans United*, 207 F.3d at 793.

### c. Redressability

The third element of standing requires a plaintiff to show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Laidlaw*, 528 U.S. at 181. However, a plaintiff "need not show that a favorable decision will relieve his **every** injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Nor does a plaintiff need to show that a favorable decision will completely relieve an injury; it is enough that a favorable decision will make progress in resolving the problem. *See Mass. v. EPA*, 549 U.S. 497, 525 (2007).

A plaintiff must demonstrate redressability separately for each form of relief sought. *Laidlaw*, 528 U.S. at 185 (citing *Lyons*, 461 U.S. at 109; *Lewis v. Casey*, 518 U.S. 343 n.6 (1996)). The Court therefore separately discusses each form of relief requested by Plaintiff. *See* (Doc. # 15 at 16.)

First, Plaintiff requests declaratory judgment that "Defendants' failure to continuously monitor opacity at [the Plant] violates the Clean Air Act." (*Id.*) The Court is satisfied that declaratory judgment, if issued, would redress Plaintiff's injury. Defendants rely on *Steel Co.*, 523 U.S at 106, to argue that a declaratory judgment is meaningless, *see* (Doc. # 38 at 8), but the Supreme Court's ruling in *Steel Co.* is easily distinguished. In *Steel Co.*, there was "no controversy over whether [a manufacturing company] failed to file reports" required by the Emergency Planning and Community Right-to-Know Act, or over "whether such a failure constitute[d] a violation;" the manufacturing company admitted as much. 523 U.S. at 106; *see id.* at 87–88. Thus, the Supreme Court held that declaratory judgment that the manufacturing company violated the act would be "worthless to respondent" (the membership organization challenging the company) and would be "seemingly worthless to all the world." *Id.* at 106. In the instant matter, however, whether Defendants violated the CAA **is** in dispute.

A declaratory judgment would have value to Petitioner and its members as they seek to impose civil penalties on Defendants and to recover fees and costs from Defendants.

Second, Plaintiff asks for injunctive relief ordering Defendants to comply with all continuous opacity monitoring requests and enjoining Defendants from operating the Plant until they do so.  (Doc. # 15 at 16.)  This injunctive relief would certainly redress Plaintiff's injuries, particularly its members' curtailment of recreational activities near the Plant for fear of not knowing air quality information.

Third, Plaintiff requests an assessment of civil penalties against Defendants, pursuant to 42 U.S.C. § 7604(a) and 40 C.F.R. § 19.4.  (*Id*.)  It has long been recognized that "all civil penalties have some deterrent effect" where citizens face ongoing violations.  *Laidlaw*, 528 U.S. at 185 (quoting *Hudson v. United States*, 522 U.S. 93, 102 (1997)).  Plaintiff asserts that Defendants' violations of opacity monitoring requirements "are repeated and likely to continue," (Doc. # 15 at 15), and the Court accepts this as true at this juncture.  *See Gladstone Realtors*, 441 U.S. at 109 n.22. *Laidlaw* is persuasive, as the Supreme Court held that because the citizen plaintiffs faced ongoing violations of the Clean Water Act, a sanction—such as a civil penalty— "that effectively abates that conduct and prevents its recurrence provides a form of redress."  528 U.S. at 185–86.  The same logic applies to civil penalties awarded under the CAA.

However, the Court agrees with Defendants' argument that civil penalties are not appropriate as to Unit 5 of the Plant.  *See* (Doc. # 33 at 15–16.)  It is undisputed that Unit 5 was permanently retired in December 2016.  (*Id*. at 15.)  In *Steel Co.*, 523 U.S. at

106–07, the Supreme Court held that "citizen suitors lack standing to seek civil penalties for violations that have abated by the time of the suit." *Laidlaw*, 528 U.S. at 187–88 (citing *Steel Co.*, 523 U.S. at 106–07). *See also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 59 (1987) ("citizens . . . may seek civil penalties only in a suit brought to enjoin or otherwise abate an ongoing violation"). Any violations at Unit 5 of the Plant are "wholly past violations," *see Laidlaw*, 528 U.S. at 188, depriving Plaintiff of the ability to sue to assess penalties.

Accordingly, the Court concludes that Plaintiff has presented specific facts establishing the three elements that are the "irreducible constitutional minimum of standing." *See Def. of Wildlife*, 504 U.S. at 560. Plaintiff has standing to bring this action against Defendants, although it does not have standing to seek civil penalties for violations at Unit 5 of the Plant. Defendants' Motion for Summary Judgment is denied.

## B. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Plant's Title V operating permit enumerates exceptions to its requirement of continuous opacity monitoring:

> CSU shall ensure that all continuous emission and opacity monitoring systems required are in operation and monitoring unit emissions or opacity at all times that the boiler combusts any fuel **except** during those periods identified in 40 CFR Part 75 § 75.11(e) and during periods of calibration, quality assurance, or preventative maintenance performed pursuant to 40 CFR Part 75 § 75.21 and Appendix B, periods of repair, periods of backups of data from a data acquisition and handling system or recertification performed pursuant to 40 CFR Part 75 § 75.20.

(Doc. # 33-1 at 30) (emphasis added).

Plaintiff seeks summary judgment that Defendants violated the Clean Air Act on 91 occasions for which opacity data is unavailable because, Plaintiff asserts, none of

the above-listed exceptions applied to those 91 instances of downtime. (Doc. # 34.) Relying only on Defendants' LogBook entries and the quarterly reports Defendants filed, Plaintiff asserts that the 91 incidents were not excused by any exception and were therefore violations of the Clean Air Act. (*Id*. at 14–19.)

However, Defendants set forth in their response (Doc. # 37) "specific facts showing that there **is** a genuine issue for trial." *See Anderson*, 477 U.S. at 256 (emphasis added). Defendants' expert report by Ralph Roberson, a professional engineer with extensive experience in emissions, details each of the 91 incidents individually. (Doc. # 33-1 at 86–115.) Relying on a site visit, interviews with Defendants' employees, and documentation, Defendants' expert explains what caused each "event" of downtime and how Defendants responded. (*Id*. at 99–108). These explanations are significant probative evidence that may support a finding that the incidents of downtime were excused and thus, a verdict in Defendants' favor. *See Jaramillo*, 680 F.3d at 1269.

The Court concludes that there are genuine issues of material fact as to whether the 91 incidents of downtime were excused pursuant to the Permit's terms. Plaintiff is not entitled to judgment as a matter of law that these incidents violated the Clean Air Act. The Court denies Plaintiff's Motion for Partial Summary Judgment (Doc. # 34.)

## IV.  CONCLUSION

Accordingly, it is ORDERED that Defendants' Motion for Summary Judgment (Doc. # 33) is DENIED. It is

FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment (Doc. # 34) is DENIED.


DATED:  January 8, 2018

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge